IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **JUDY L. PRITCHETT,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil No. 10-804-WDS-CJP** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT and RECOMMENDATION

**PROUD, Magistrate Judge:**

This Report and Recommendation is respectfully submitted to District Judge William D. Stiehl pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Judy L. Pritchett seeks judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to **42 U.S.C. § 423**.[1]

## Procedural History

Ms. Pritchett's application for DIB and SSI was denied initially and on reconsideration. After a hearing, Administrative Law Judge (ALJ) Sherwin F. Biesman denied the application on

---

[1] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

November 27, 2009. (Tr. 13-20). Plaintiff's request for review was denied by the Appeals Council, and the November 27, 2009, decision became the final agency decision. (Tr. 1).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint.

## Issues Raised by Plaintiff

Plaintiff filed a Motion for Summary Judgment at **Doc. 23.** She raises the following issues:

1. The ALJ erred in assessing plaintiff's credibility.

2. The ALJ erred in weighing the medical evidence.

2. The ALJ's assessment of plaintiff's residual functional capacity (RFC) was not based on substantial evidence.

## The Evidentiary Record

This Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record, focused on the issues raised by plaintiff.

### 1. Medical Treatment

The only records of treatment are from Dr. Thomas Kupferer, D.O., of the Family Medical Clinic in Murphysboro, Illinois. Most of the office notes are hand-written and are difficult to read.

Plaintiff was seen in February and April, 2006, for high blood pressure, heart palpitations and chest pain. Dr. Kupferer prescribed Toprol and Avililde. (Tr. 181-185).

On July 5, 2006, the office note indicates that plaintiff had "no complaints" and was tolerating her medication fine. The note goes on to say that she had occasional headaches and

chest pain, and that she still had joint pain. Her skin was very photosensitive. The assessment was hypertension and lupus.[2] She was advised to continue her medications and to stop smoking. (Tr. 178). On September 27, 2006, she complained of joint pain which had gotten worse over the last few months. The assessment was lupus. (Tr. 177).

On October 11, 2007, plaintiff told Dr. Kupferer that she had swelling, stiffness and pain in her hands, knees and ankles. He noted that she had a diagnosis of lupus and a history of Raynaud's, and noted that she needed updated lab tests. (Tr. 235).

Ms. Pritchett complained of shortness of breath and increased heart rate on March 31, 2008. The nurse's note says that she would like a referral for her lupus. Again, the doctor's notes are difficult to read. There appears to be a notation regarding loss of sensation in her hands and fingers, and chest pain on exertion. Dr. Kupferer ordered lab work. It is unclear whether he made a referral to another doctor on that visit. (Tr. 234).

Lab tests were done in April, 2008. The test for antinuclear antibodies was positive.[3] (Tr. 244). Results of complete blood count with differential testing were normal in all respects. Thyroid testing was normal. Her HDL cholesterol was low and her LDL cholesterol was high.

---

[2]According to the Mayo Clinic's website, "Lupus is a chronic inflammatory disease that occurs when your body's immune system attacks your own tissues and organs. Inflammation caused by lupus can affect many different body systems, including your joints, skin, kidneys, blood cells, heart and lungs." http://www.mayoclinic.com/health/lupus/DS00115, accessed on July 6, 2011.

[3]This test is used to screen for autoimmune disorders, including systemic lupus erythematosus. A positive result does not, however, necessarily mean that the patient has lupus. http://www.mayoclinic.com/health/lupus/DS00115/DSECTION=tests-and-diagnosis, accessed on July 6, 2011.

(Tr. 231-232). A lupus anticoagulant comprehensive panel detected no lupus anticoagulant.[4]

Dr. Kupferer saw plaintiff on April 14, 2008. The note is difficult to read, but it appears to say "visual dysfunction" and references an appointment, possibly at "Barnes" on April 23. (Tr. 230).

Plaintiff returned on June 16, 2008. The nurse's note says "nervous all the time." (Tr. 243). The doctor's notes are difficult, if not impossible, to read.

Plaintiff was seen by Dr. Kupferer in October, 2008, for a urinary tract infection. (Tr. 242).

In June, 2009, Ms. Pritchett presented with complaints of low back pain and frequent urination. It was noted that she had no insurance and no money for testing. The impression was abdominal pain, rule out cystitis. She was prescribed an antibiotic and Darvocet. (Tr. 240). In August, 2009, plaintiff saw Dr. Kupferer for "possible shingles." (Tr. 239-240).

**2.     Consultative Examinations**

Adrian Feinerman, M.D., performed a consultative physical examination on August 15, 2007. (Tr. 187-191). Ms. Pritchett complained of pain in her entire body and fatigue. She was 51 years old and had previously worked as a nurse's aid. She began "getting tired" in 2005, and had gradually worsening fatigue and aching. She had been told she had cutaneous lupus. She had hypertension for the past 32 years. She also complained of a dull ache in her chest upon exertion or lifting. She did not identify any treating doctor other than Dr. Kupferer. She

---

[4] "Lupus anticoagulants are antibodies against substances in the lining of cells that prevent blood clotting in a test tube." They are "are usually found in persons with autoimmune diseases, such as systemic lupus erythematosus (SLE)."
http://www.nlm.nih.gov/medlineplus/ency/article/000547.htm, accessed on July 8, 2011.

indicated that she could walk 50 feet, stand for 30 minutes and sit for 30 minutes.  She said she could squat, bend and perform fine and gross manipulation without difficulty.

She had scarring on her upper body from blistering which was caused by "any type of sun exposure or hot weather."  She said she had headaches which she related to her eyes.  She had blurred vision when her blood pressure was up.  She had dizziness when she got up too quicky or went down stairs.  She said that her hair was falling out and her skin hurt to touch.  She had frequent pain in her shoulder, hip, knee, ankle and finger.  She denied joint swelling.

On physical examination, Ms. Pritchett was 5 feet, 2 inches tall and weighed 154 pounds.  Her blood pressure was 150/100.  With glasses, her vision was 20/50 on the right and 20/70 on the left, with no improvement with pinhole correction.  Her lungs were clear to auscultation and percussion, with no wheezes, rales or rhonchi.  Her heart rate was regular and she had no murmurs, gallops or rubs.  She had no limitation of motion of any joint.  Grip strength was strong and equal bilaterally.  There was no anatomic deformity of the cervical, thoracic or lumbar spine.  She had no limitation of movement of any part of her spine.  She was able to walk 50 feet and to get on and off the examination table without assistance.  She had no pain in her weight bearing joints.  She could tandem walk, walk on heels and toes, squat and rise from a chair with no difficulty.  Muscle strength was normal throughout, with no spasm or atrophy.  Fine and gross manipulation were intact.  Straight leg raising was negative.  Sensory examination was intact and her deep tendon reflexes were intact and equal.  Her behavior, memory, concentration and ability to relate were all normal.  His impression was discoid lupus,

hypertension and noncardiac chest pain.[5]

Harry J. Deppe, Ph.D., performed a consultative psychological examination on June 21, 2008. (Tr. 209-214). Ms. Pritchett said she was not receiving any mental health treatment. She stated that she had angina and lupus, and had difficulty concentrating.

On examination, plaintiff was oriented to reality. Her level of intellectual ability was at least average. She had no difficulty staying on task. She had no formal thought disorders. Her memory for immediate, recent and distant events were intact. Her fund of general knowledge was good. She was able to do simple calculations. Her judgment and insight were within normal limits. Her abstract reasoning skills were good.

### 3. Residual Functional Capacity Assessments

On August 22, 2007, state agency physician Ernst Bone, M.D., evaluated plaintiff's RFC, and concluded that she could do medium exertional activities, i.e., she could frequently lift 25 pounds, occasionally lift 50 pounds, stand or walk for 6 out of 8 hours, sit with normal breaks for 6 out of 8 hours, and had no push/pull limitations. In making this assessment, the doctor cited Dr. Feinerman's findings. Dr. Bone found no postural or manipulative limitations. He did note that she had some visual limitations with regard to near and far acuity, and that, as a result, she should not perform work that requires fine vision skills. (Tr. 194 -201).

Plaintiff's treating physician completed an RFC assessment form. There are two copies of the form at Tr. 245-252. One copy is dated October 31, 2007, and the second is dated October 26, 2009. Dr. Kupferer's assessment is the same on both forms, and is much more limited than

---

[5]There are four types of lupus: systemic lupus erythematosus, discoid lupus erythematosus, drug-induced lupus erythematosus and neonatal lupus. http://www.mayoclinic.com/health/lupus/DS00115, accessed on July 6, 2011.

Dr. Bone's. He found that Ms. Pritchett could frequently lift less than 10 pounds, occasionally lift less than 10 pounds, stand or walk for less than 1 out of 8 hours, must alternate between sitting and standing to relieve pain, and was limited in her ability to push/pull. She could only occasionally do postural activities such as climbing, kneeling and stooping, etc. She had manipulative limitations in that she could only occasionally reach, handle, finger and feel. She had visual limitations. She should avoid temperature extremes, vibration, humidity, and hazards such as machinery and heights. (Tr. 245- 248).

**4.   Agency Forms**

On a work history report form, Ms. Pritchett indicated that she had worked as a nurse's assistant in a nursing home from 1985 through 2002. She had worked as a nurse's assistant for a nursing agency from 2002 through June, 2006. (Tr. 112).

**5.   Evidentiary Hearing**

The hearing took place on October 13, 2009. Plaintiff was represented by counsel. (Tr. 24).

Ms. Pritchett testified that she had initially been diagnosed with cutaneous lupus, but the diagnosis was later changed to systemic lupus. (Tr. 34). She has continuous pain in her hands, arms, legs and feet. She is tired all the time, but cannot sleep. She gets rashes on her body which start out as blisters and which leave scars. (Tr. 35). She was also diagnosed with Raynaud's syndrome, which causes numbness and tingling in her hands.[6] (Tr. 38).

---

[6] Raynaud's syndrome, also called Raynaud's phenomenon, causes some areas of the body (fingers, toes, tip of nose, ears) to become numb and cold due to narrowing of the small arteries that supply blood to those areas. It is often seen in people who have lupus erythematosus.
http://www.mayoclinic.com/health/raynauds-disease/DS00433, accessed on July 6, 2011.

She had seen Dr. Kupferer a few days earlier. He had done x-rays and a sonagram on her left arm which showed she had arthritis in her elbow and shoulder and "erosion" of the bone. (Tr. 32-33). The sonagram was done because her arm gets cold and purplish. The sonagram was clear. The only explanation she has been given for the cold and purple color is Raynaud's syndrome. (Tr. 33). (The administrative record does not contain a record of a visit with Dr. Kupferer in October, 2009).

Ms. Pritchett testified that she stays on the sofa "pretty well 100 percent of the day." She does nothing outside the house. (Tr. 30).

### **Applicable Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged

to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **See,** ***Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992);** ***Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the Commissioner finds that the claimant has an impairment which is severe and she is not capable of performing her past relevant work, the burden shifts to the Commissioner to show that there are a significant number of jobs in the economy that claimant is capable of performing.  **See,** ***Bowen v. Yuckert*, 482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** ***Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).**

It is important to keep in mind the proper standard of review for this Court.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  **42 U.S.C. § 405(g).**  Thus, the issue for this Court is not whether Ms. Pritchett was, in fact, disabled during the relevant time period.  Rather, this Court must determine whether ALJ Biesman's findings were supported by substantial evidence and whether any errors of law were made.  **See,** ***Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing** ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).**

In reviewing for substantial evidence, this Court uses the Supreme Court's definition, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  ***Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).**  Further, the entire administrative record is taken into consideration, but this court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).**  However, while

judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## Analysis

Here, the ALJ followed the five step analysis. He concluded that plaintiff had not worked since the alleged onset date, and that she has severe impairments of lupus, chest aneurysm, hypertension, Raynaud's syndrome and degenerative joint disease. (Tr. 15-16). He concluded that these impairments do not meet or equal a listed impairment. (Tr. 16-17). Plaintiff does not challenge the finding that her condition does not meet or equal a listed impairment.

In assessing the opinion evidence, the ALJ discounted Dr. Kupferer's RFC assessment because it was "completely unsupported by any treatment notes or objective medical findings." (Tr. 18). He assessed Ms. Pritchett as having the RFC to do a full range of medium work, i.e., frequently lift 25 pounds, occasionally lift 50 pounds, stand or walk for 6 out of 8 hours, sit with normal breaks for 6 out of 8 hours, and no push/pull limitations. (Tr 17).

The ALJ found that plaintiff's statements about the intensity, persistence and limiting effects of her symptoms were "not credible to the extent they are inconsistent with the [RFC] assessment." (Tr. 18).

There was no testimony from a vocational expert. Using the "grids," (20 C.F.R. Part 404, Subpart P, Appendix 2), he determined that she was not disabled because she could do a full range of work at the medium level and had no nonexertional limitations. (Tr. 19-20).

Plaintiff first takes issue with the ALJ's findings as to her credibility. ALJ Biesman

found that Ms. Pritchett's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 18).

The Seventh Circuit criticized similar language in **Parker v. Astrue, 597 F.3d 920, 921-922 (7th Cir. 2010)**, stating that "It is not only boilerplate; it is meaningless boilerplate." As in *Parker*, the ALJ's statement is meaningless because it does not communicate what weight he actually gave the testimony.

It is also problematic that the ALJ rejected plaintiff's testimony to the extent that it did not mesh with his findings as to RFC. This approach "turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits." **Brindisi v. Barnhart, 315 F.3d 783, 787-788 (7th Cir. 2003)**.

The Commissioner argues that the ALJ's credibility analysis was sufficient because he "explicitly discussed Plaintiff's testimony, symptoms, daily activities and medication effects." Doc. 25, p. 11. If the ALJ had set forth an explicit discussion of the evidence, the fact that he ultimately expressed his credibility findings in the above-quoted boilerplate might not be determinative. However, while the ALJ may have summarized the evidence, he did not discuss or analyze it.

The ALJ simply summarized plaintiff's statements, but he did not set forth any analysis beyond noting that, one month after the alleged onset of disability, she told Dr. Kupferer that she had no complaints and was tolerating her medications. (Tr. 18). This observation was evidently

-11-

meant to illustrate that Ms. Pritchett's statements to her doctor contradicted her testimony. However, the ALJ ignored the rest of the treatment note for the day in question, which states that she had occasional headaches and chest pain, she "still" had joint pain and her skin was "very photosensitive." (Tr. 178). When considered in its entirety, Dr. Kupferer's note of July 5, 2006, was not inconsistent with Ms. Pritchett's statements.

The ALJ's credibility determination was erroneous because it consisted only of boilerplate. The ALJ is required to give "specific reasons" for his credibility findings. ***Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)**. It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. ***Ibid***. See also, ***Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir., 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.")** If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. ***Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)**.

Plaintiff also takes issue with the ALJ's consideration of the medical evidence. First, the ALJ struck two medical reports, designated as Exhibit 7F, from the record because the signature on them was illegible. One of the reports was a physical RFC assessment, and the other was a mental RFC assessment. At the hearing, the ALJ asked plaintiff's counsel to submit "something that clarifies" that exhibit. (Tr. 40). The two reports were, in fact, authored by Dr. Kupferer. Plaintiff's counsel resubmitted at least one of the reports with a stamp indicating that it was from Dr. Kupferer on November 4, 2009. See, Tr. 154. The physical RFC assessment was made part of the record and designated as Exhibit 12F. The ALJ was evidently unaware that counsel had resubmitted the report, since he struck Exhibit 7 because "The requested proof of evidence was

never received." (Tr. 19).

It is difficult to see how striking Exhibit 7 could have prejudiced plaintiff. The ALJ considered Dr. Kupferer's physical RFC assessment, which he referred to as Exhibit 12F. Dr. Kupferer's mental RFC assessment was not made part of Exhibit 12F. However, as Dr. Kupferer did not assess any mental limitations, the failure to consider it could not have prejudiced plaintiff.

Plaintiff also argues that the ALJ should have assigned greater weight to Dr. Kupferer's opinions because he was a treating physician. The ALJ rejected Dr. Kupferer's assessment because it was "completely unsupported by any treatment notes or objective medical findings." (Tr. 18). However, the record does not support this view of the evidence.

First, there were objective medical findings. In April, 2008, the test for antinuclear antibodies was positive. (Tr. 244). Further plaintiff testified at the hearing that she had seen Dr. Kupferer a few days earlier and he had done x-rays of her left arm which showed she had arthritis in her elbow and shoulder and "erosion" of the bone. (Tr. 32-33). There is no indication that the Agency tried to get the records from that visit, despite the fact that 20 C.F.R. §404.1512(d) provides that it is the Agency's responsibility to develop the record.

Further, the Court has noted that Dr. Kupferer's handwritten notes are very difficult to read. The ALJ did not set out any meaningful discussion of the content of the treatment notes, except to observe that Dr. Kupferer's RFC assessment was not supported by the treatment notes. See, Tr. 18. In his brief, the Commissioner sets out his interpretation of the notes. However, it is debatable whether the Commissioner's interpretation is correct in view of the difficulty of reading the handwriting. Further, there is no way of knowing whether the ALJ interpreted the

treatment notes in the same way as the Commissioner, since the ALJ did not offer his interpretation of the notes. The ALJ's decision cannot be defended by reliance on grounds that he did not, himself, rely upon. See, *McClesky v. Astrue*, **606 F.3d 351, 354 (7th Cir. 2010)**.

Plaintiff also argues that the ALJ's determination of her RFC was flawed. This argument dovetails with her points about the credibility determination and the rejection of her treating doctor's opinions. The RFC determination was premised upon the credibility assessment. Because the credibility assessment and the weighing of the medical evidence were legally flawed, the RFC determination was not supported by substantial evidence. The assessment of RFC "must be based on all of the relevant evidence." SSR-96-8p, *5 (emphasis in original).[7] Further, "Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone." *Ibid*. This is not to suggest that the ALJ was required to accept plaintiff's statements about her symptoms, but he was required to consider all of the evidence and set forth an adequate analysis of her credibility.

In addition, in making his RFC assessment, the ALJ accepted the findings of Drs. Feinerman and Bone. The ALJ concluded that plaintiff had the RFC to perform a full range of medium, with no nonexertional limitations. However, both these doctors found that Ms. Pritchett had visual limitations. See, Tr. 189, 197. The ALJ ignored these findings. This was error. The ALJ may not selectively discuss a doctor's report, ignoring the parts that conflict with his decision. *Myles v. Astrue*, **582 F.3d 672, 678 (7th Cir. 2009)**; *Godbey v. Apfel*, **238 F.3d**

---

[7]Social Security Rulings "are interpretive rules intended to offer guidance to agency adjudicators." *Lauer v. Apfel*, **169 F.3d 489, 492 (7th Cir. 1999)**. Social Security Rulings are "binding on all components of the Social Security Administration." **20 C.F.R. § 402.35(b)(1)**.

**803, 808 (7th Cir. 2000).**

In this case, the ALJ used the grids to determine that Ms. Pritchett was not disabled. The grids may not be appropriate where the claimant has both exertional and nonexertional limitations. (20 C.F.R. Part 404, Subpart P, Appendix 2, §200.00(e). See also, ***Haynes v. Barnhart*, 416 F.3d 621, 628-629 (7th Cir. 2005).** The ALJ gave no reason for rejecting the visual limitations assessed by both Drs. Feinerman and Bone. If he had accepted those limitations, the use of the grids to determine disability might not have been appropriate.

The Commissioner's decision is the product of legal errors and is not supported by substantial evidence. This case should be reversed and remanded.

Remand of a social security case can be ordered pursuant to sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand depends upon a finding of error, and is itself a final, appealable order. In contrast, a sentence six remand is for the purpose of receipt of new evidence, but does not determine whether the Commissioner's decision as rendered was correct. A sentence six remand is not an appealable order. **See,** *Perlman v. Swiss Bank Corporation Comprehensive Disability Protection Plan*, **195 F.3d 975, 978 (7th Cir. 1999).**

Here, a sentence four remand is appropriate.

### Recommendation

This Court recommends that plaintiff's Motion for Summary Judgment **(Doc. 23)** be **DENIED** and that the Commissioner's final decision be **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

Judgment should be entered in favor of plaintiff.

Objections to this Report and Recommendation must be filed on or before **July 25 , 2011.**

**Submitted: July 8, 2011.**

<u>**s/ Clifford J. Proud**</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**
